I am assuming that, since this is on a petition for rehearing, that the Court will be most interested on the issue that was raised, and in particular, in the Court's most recent order, which asked us to focus on the issue of whether the duty of good faith and fair dealing applies here. We also, and I understand that the Court has the benefit of the supplemental briefs filed by both sides, which I believe address that as well, but I would like to make a few key points here. First and foremost, because this is a case for controversy that's before the Court and not a hypothetical question, I think that the issue here is inextricably bound up with some of the key facts. In particular, the facts of the circumstances in which the easement, the power-line easement, was granted, and the fact that that was unquestionably a default and a breach of the covenant under Section 13.2 of the Purchase and Sale Agreement, as well as, by the way, a breach of Section 9.5, which obligated the lids to use their own property for those purposes. Now, the point of that is this. Aside from the closing conditions and the lids' inability to satisfy the closing condition to deliver the title, an approved title condition, this is a separate and independent breach. It occurred after, so far as encumbrances were concerned, title was already in the approved title condition back in May 2004, when this contract was entered into. In other words, actually, nothing had to be done by the lids except not breach the Purchase and Sale Agreement by encumbering the property, by entering it to an agreement that could or would survive the closing on the property without tolls' consent, and so on. So that, for that reason, that necessarily impacts the whole analysis here, both in terms of whether or not- Well, they didn't contemplate a permanent encumbrance. Section 13.2 begins by saying except as necessary to comply with the terms of the agreement. And the reason for this easement that they gave was to perform work ultimately that was necessary to complete the transaction. But the evidence is undisputed, and in the record, Judge Corbett, that they had an alternative route available that did not cross subarea 3, and they chose not to do that route because they thought it might interfere with their other work and also because it might cost them $50,000 to $100,000 more. And that removes the issue of necessity. And to your view, suppose that by the date of what you say is the closing, and, of course, the question is, what is the closing date? Or was there a fixed closing date? But if by the date, was it June 27th that we're talking about? June 30th. The public service utilities had removed the wires, the overhang wires. Would you still be making this argument? The issue is not the wires. The issue is the easement itself because that prevented us from having marketable title. Well, if they had given up the easement- If that had been the case- They ultimately got the easement back in 2008. But suppose by the time of the closing, whenever that date is, the easement had been removed. Would you still be making the same argument? No. If the easement had been removed, the breach of Section 13.2, which was an implied repudiation, would have been cured. And they also would have been able to deliver title in the approved title condition on the date of closing. I mean, I don't think we would be here today but for the fact that they took an affirmative act which breached Section 13.2 and, in addition to that, could not satisfy the closing condition by delivering approved, the title in approved title condition. All right. You have several sections, though, that are at play here. And I think you contend that a comparison of the PSA Sections 5.4 and 5.5 supports the conclusion that 6.1 was for Toll Brothers' benefit because only Section 5.5 mentions Section 6.1. But what should we make of the fact that Section 5.5 references Section 6.1c when there is no c in Section 6.1? I'd like to tell Your Honor that I have a glib answer for that, but I don't. Because the reason that it still refers to 6.1c is not in the record. But let me just correct one thing, if I may. And that is we really have posited two alternative arguments. One is that it was really for our favor. But we're also ---- Well, I think we kind of, you know, more than not having a good answer, I mean, could You know, I'd like to have some answer. I mean, could we conclude this reference to 6.1c in Section 5.5 was a drafting error and therefore does not affect our analysis of 6.1? Or would the consideration of this issue require remand? I think that the ---- I can only view it as a drafting error. But again, I want to make clear that that is not on the basis of any fact in the record. So necessarily I'm speculating. But my point is this, though. The district court determined that either party could extend the time for closing, but only if the other party was in default. In other words, not the only party was in the way. Also, counsel, Judge Gould, could I interject a question on that? Sure. I know what the district court said, but I think we review the contract law issues to NOFO. Yes. So why don't we just look at 6.1. You know, it has the first part of closing on a scheduled date, and then it has a second part that says that it's three days after all the conditions are satisfied. So why shouldn't that be, as it is literally, for the benefit of both parties? That is, why doesn't it permit toll to say if the condition was not satisfied, that we couldn't deliver title as of the date of the initially scheduled closing, then the time was extended, and it would be extended under California law for a reasonable time? And why isn't that the proper contract interpretation? Let's assume for purposes of argument that we go down that course. There's a couple of problems. First of all, the issue of what constitutes a reasonable time, which under the Stockton case cited in our supplemental brief, does not depend on whether or not the other party is seeking to perform in good faith. It depends primarily on what the purpose and intent of the parties were at the time they entered into the contract, which was back in 2004. The other point that's, I think, important to note about Stockton was the court of appeal approved there the alternative ground on which the superior court ruled, which was that there was an additional breach of the contract, and that was the fact that they did not start construction at the time the contract was entered into and did not have the construction completed. So we have an analogous situation here because we have a separate and independent breach of the contract that was not cured as of the time toll rescinded, even though they had plenty of time to do that. Well, but if we were to say, if we were to accept and agree with the Lynn's interpretation of 6.1, would California's implied covenant of good faith and fair dealing save the PSA from being illusory? And also, how would the duty of good faith and fair dealing apply to PG&E? Well, I'm not sure I understand the second part of Your Honor's question in terms of applied to PG&E. Well, you have ñ well, if ñ did you ñ did the Lynn's have control over lifting the encumbrance? The Lynn's did not have control, but only because they had disabled themselves from control. In fact, the testimony was, and I could give, Your Honor, the cites to the reporter's transcript, that the initial draft submitted by the Lynn's attorney, Mr. Inderbitzen, did retain control and provided alternatively either notice from the Lynn's or a date certain. Well, okay. But here, the problem was that there's this PG&E problem at the ñ on June 30th. So the Lynn's are saying that their interpretation of 6.1 is that California's implied covenant of good faith and fair dealing saves the PSA from being illusory because that they acted with good faith trying to get PG&E to do it. And, in fact, we know that in 2008 it was, in fact, removed. But does ñ you know, why aren't they right on that? Okay. They're not right for several reasons. First of all, the Stockton case says that 1657 would set a reasonable time and that the duty of good faith and fair dealing does not have a role here because of the fact that it's covered by statute. That's number one. Number two, they actually at the district court relied on the covenant of cooperation. That is the way everybody's interpreted here, or at least the Lynn's at the district court. That's exactly analogous to the duty of good faith and fair dealing. And you don't use the duty of good faith and fair dealing when you already have an expressed term in the contract. I don't ñ I don't ñ I don't quite understand that argument. The 6.1, you argue, if it operates as an automatic extension of the closing date by fixing it for three business days after all special closing conditions have been satisfied, is illusory because they could never satisfy the conditions and therefore they could just keep the money without satisfying the conditions, and this is an illusory promise. What saves that is a duty of good faith and fair dealing. That is, they have to act in good faith to satisfy the conditions and within a reasonable time. And what's a reasonable time here depends on a number of factors, but there's California ñ there's the Ninth Circuit case law construing California law that says that a covenant of ñ the implied covenant of good faith and fair dealing saves a contract like this from being illusory. My point is this. First of all, the Stockton case ñ The clause that you're referring to is that they would cooperate with each other in trying to get ñ meet all the closing conditions is somewhat different. Well, but the point is this. The duty of good faith and fair dealing under third story music does not even apply here because it is not legally necessary. You don't even reach that point. It's legally necessary if it's necessary to save the contract. I would assume that's what that phrase means, from being illusory. No. Third story music lists a number of factors that are considered in that regard. One cannot ñ That's the four-part test. That's right, the four-part test. One cannot simply toss in the covenant of good faith and fair dealing to say, okay, you don't get ñ you have to waive, in effect, contractual breaches so that this contract can go forward. And I think it's extremely important to bear in mind, again, that that breach of 13.2 is a separate and independent breach of a covenant that's separate and apart from the closing conditions. And nobody has suggested how somehow the duty of good faith and fair dealing or the breach of ñ or the covenant to cooperate somehow saves this. What this point ñ Judge Gould, if I could interject on that. If your argument is that there's a prior breach when they convey the easement without agreement, why wouldn't that necessarily be only a partial breach if, in fact, the easement was reconveyed? And at a time of closing, it could convey good title. So why wouldn't that be a partial breach if they had improperly conveyed an easement but got it back? First of all, by definition in 13.2, it could not be deemed a partial breach by any stretch of the imagination because 13.2 clearly contemplates temporary agreements as well as permanent agreements. That would be number one. Number two, if they're still in breach, they're in breach as of the closing date or any other time. Now, if they're in breach and they have, by implication, repudiated the contract by being in breach, then Toll had a right to rescind until they cured that repudiation. And number three, let me point out one other critical factor, and that is Section 4.4, the Liquidated Damages Clause. The LIDs are entitled to get liquidated damages if toll is in default, but only if the LIDs are also not in default. And I don't think any argument can be made that they were not in default under 13.2. All right. Does the panel have additional questions? They were under default at what point? They were in default from the moment that they gave PG&E that easement. Now, they concealed that from Toll, and Toll didn't discover it until it got a title report in the spring of 2007. Well, 13.2, for example, it says, shall not encumber or transfer any interest in all or any portion of the property between the date of disagreement and the closing date. We don't know when the closing date is. It has no closing date. Well, then you're writing 13.2 right out of the purchase and sale amendment. No. You, whoever drafted this contract, did a lousy job, and you entered into this contract and included the reference to Section 6.1c that doesn't exist. But you could have fixed a clear closing date, and you chose not to because it also, leaving it open in this way, given the nature of this transaction, potentially operated to your benefit. Your Honor, the point here is. In retrospect, it did with respect to this issue of the conveyance for the school property. 13.2 makes no reference to this being a breach only if the condition exists at closing. It's a breach when it occurred. It doesn't matter when the closing date was. It was a breach when it occurred. It was a knowing and willful breach. And the closing date at Section 6.1, and the duty of good faith and fair dealing, and the covenant of cooperation can't be used to simply wipe out Section 13.2 at a breach of contract. I don't know of any authority that says those could be used for that purpose. And whether the contract is poorly written or not, that is what the contract is. All right. You've exceeded your time, unless the panel has. Does the panel have any additional questions? I do not. All right. No. We've. I'll give you two minutes on rebuttal. Thank you, Your Honor. All right. Good afternoon. Good afternoon, Your Honors. Sorry. I want to start by. Can you state your name for the record since we. Certainly. Certainly. I'm Sue Handelman from Ropers Majeski on behalf of the Lynn family. I want to start by thanking this Court personally and on behalf of my clients for sticking with this case. It's very important to us. Well, we consider all cases important, so we appreciate that. Perhaps I, since we've focused the issue somewhat, maybe, you know, what I'd like you to answer is how would either the mutual cooperation provision of the PSA or California's implied covenant of good faith and fair dealing apply to PG&E, since PG&E was the one that had the control over removing this easement? I'll respond to that by referring the Court to a couple of California Supreme  Court documents. The first one is the PG&E, which says that when there's no time, as there wasn't a time in the, you know, in the easement there was an agreement that the PG&E would remove the easement as soon as the Lynn's got the infrastructure done in the street so that it could accommodate underground the utilities. So with that agreement in mind and that agreement spelled out in writing in the easement, they had an obligation under Bleacher v. Conte where there was no time for PG&E to get that easement off. They had an obligation of good faith and fair dealing to get that easement off as, with all diligence. But doesn't the good faith and fair dealing generally apply to the parties to the contract, not to a third party? That's, I mean, this is different in that sense. And I'm, what I'm trying to do is to use the contract. There was a contract between PG&E and the Lynn's, which was that easement. All right. But that's not between, but the contract, the PSA is between the Tolles and the Lynn's. And that's true, too, Your Honor. That's exactly right. So how can the Tolles, how can the Tolles or the Lynn's do any, you know, the Tolles didn't know anything about it. So they can't do anything about it. So how can the Lynn's get PG&E to remove it any, they couldn't get it to remove it by the June 30th date, right? That's true. And they couldn't give an indication on that date when it would be removed, right? On that date, they were still trying to get the easement removed. And what Your Honor points out is something very important to this case, and that is that there is no, this record doesn't reflect any giving up by the Lynn's of pursuing the removal of that easement. In other words, the Lynn's at all times were pursuing PG&E to get that easement removed. In fact, what the record says. Well, we know now it got removed in 2008. That's right. But what if it had gotten removed in 2011? Do the Tolles have to wait for that? That's where. I mean, how do we, and, you know, since PG&E was the one that had control over removing it, how, you know, and their argument is that it's illusory because PG&E is the only one that could do it. And clearly the test can't be 20-20 hindsight. No. But what we do know is that the Lynn's terminated, I'm sorry, the Tolles terminated performance in December of 2007. And the court said that was premature. The duty of cooperation was breached by Tolles when it failed to cooperate at that point. So we know that when Tolles withdrew from this deal, it was too soon. How long was too long is sort of a rhetorical question. It's something that we can't know because the contract was terminated by Tolles in December of 2007. Had this contract proceeded with both sides, the Tolle trying to reconvey the school side or getting that condition performed, and the Lynn's trying to get PG&E to get that easement off, if this had progressed into 2011 and one side or the other under Section 14.3 said that there was a material change that affected the faculty of this contract to proceed, then at that point it may have been possible for someone to call a breach. But it was premature when Tolles terminated. And that's what the duty of good faith and fair dealing is all about. I wonder how clear all of this was since you won once and they won once already. I mean, you know, if it were so clear, you know, that's, you know, that the parties are all, you know, I don't think anyone can say it's all that clear. I'm hoping to not portray this as clear. As this Court is quite aware, this is a very, very complex transaction that was performed over a period of years. And, you know, speaking of whether we can get third parties, we the Lynn's, can get third parties. I mean, I don't think that this contract was all about, Your Honor. This contract was about cooperation with the fish and game. There was a stream. Were the Lynn's ever able to give any date when the easement would be removed? The Lynn's continued. Before Tolles said it's done, I'm pulling out. There was no. Did the Lynn's have any date that they ever said, okay, we'll be able to get it removed by such and such a date? What the Lynn's continued to do was continue to work with PG&E to get that easement removed. And the record reflects. Okay. But my answer can be yes or no. Did they ever give a date? There was no date given. And, however, every condition precedent for removal of that easement, which was in the agreement between Lynn's and PG&E, was completed before the scheduled closing date. According to the facts as found by the district court judge, the easement, the underground utilities were completely built and the conditions were ready for that easement to be released months before the scheduled closing for subarea 3. That PG&E was dilatory is what Your Honor points out quite true. We had nothing that we could do except to push that, and they had an obligation in the easement to give that temporary easement up. Would you have a stronger argument if you had gone to Tolles and talked to them before you did that and they said okay? Would you have a stronger argument that both of you had worked in terms of good faith and fair dealing? You know, Your Honor, I don't think so. Here's why. That can't be right. I mean, that doesn't mean that you lose, but that can't be right. If they were a party to all of this, then clearly you would have a stronger argument. Let me explain, if I can, about why that easement came into effect in the first place. That easement came into effect because of a need for housing credits and so forth for the closing of subarea 2. Keep in mind, that easement was agreed to, the temporary easement, was agreed to in December of 2005, and it was recorded in March of 2006. Subarea 2 was to close in the ‑‑ in June, June 30th of 2006. Subarea 2 needed affordable housing credits in order to close. The court found that it was ‑‑ the pumping station, power to the pumping station was needed in order to facilitate the close of subarea 2. There was no expectation on the part of the LHINs or Tolles. When Tolles learned of that easement, which according to the district court's decision was in 2006, they thought it would have no effect on the development of subarea 3. So the point is, is that that easement was granted to PG&E in a negotiated process. We tried to ‑‑ the LHINs tried to get a date certain. PG&E wouldn't give it. But we got an agreement in the easement written that it would be removed as soon as the underground facilities were built, and that condition to removal of the easement agreed to by PG&E was performed. Well, how did Tolles find it? Your argument implies that Tolles knew about the easement. How did they find out about the easement? I'm not sure. Mr. Painter, the evidence ‑‑ sorry, the evidence in the record. What does the record show? The record shows that Mr. Painter said he knew about the easement in September of 2006, and he felt it did not interfere with development. Now, another of the Tolles representatives, Mr. Inouye in the record, said that he found out about the easement in March or April of 2007, and that Tolles didn't raise it as a closing issue until well into June, just before the project was about to close. So there was no indication as this development proceeded that the overhead line was in any respect a problem. If I could, I'd like to respond to some of the points that were addressed by my opponent before my time expires, because, as the Court knows, it's quite ‑‑ we tried to be as specific as we could in our final brief to explain the good faith and fair dealing and that sort of thing. There's questions. You've got to answer them. Otherwise, use your time as you have it. Thank you, Your Honor. First, the continuing statement that the Lins breached 13.2 by putting a section 13.2 of the agreement by putting up the easement, that is only possible to even make that statement by ignoring the first provision, first part of section 13.2, which says that we aren't to encumber or otherwise put up easements or that sort of thing unless it's necessary to comply with the agreement. And I've been through that. It was necessary, and the district court so found. As far as an anticipatory repudiation, Taylor v. Johnston, which is their main case on anticipatory repudiation, requires a repudiation that puts performance completely beyond possibility. And as we know in this case, performance was always possible. It's not enough that it's made more difficult or delayed. It was possible, and, in fact, we did perform late. Well, what if what, okay. What if, let's say that, this is a hypothetical, but what if the fact that the encumbrance was not removed caused them to have to, and I know this wasn't the case, but caused them to have to delay construction and caused a lot of damages along, you know, from, because everyone knows that doing construction, if you have to delay it, then there, you know, every, you know, it's just a house of cards, and there were a lot of damages. Had that been the case and the contract was still in effect, would the LHINs have been responsible for that? It's hard to say in the hypothetical, Your Honor, because what the contract provides is that the, the Title V conveyed at closing, and the LHINs, in fact, weren't building on Subarea 3, and the LHINs, in fact, said it didn't interfere, the power line, the temporary power line didn't interfere with their construction. So it's hard to say. But if they were to be able to show that it did interfere with their construction and the LHINs were the ones that authorized PG&E, and they had, would they have been able to, would they, would the LHINs have been responsible for those damages? It could have been, Your Honor. I don't know. There's no, the evidence isn't to that effect and the judge didn't find to that effect. I want to proceed with the notion that the power line wasn't necessary because it could have gone to a different route. Necessary does not, is not defined by route. The word necessary is used in the agreement to say that it is necessary to comply with the agreement. And we've explained that. 6.1c, it's, it is unknowable how that provision got in there. But I agree with my opponent on it, that it was probably a drafting error. There are other drafting errors in this agreement that the Court probably saw. It at one point refers to the fourth closing when, in fact, there were only three. There are other minor typing details of that sort. Probably should have been cleaned up. But as you know, there is no 6.1c left in the agreement. 6.1c, it's, it is unknowable how that provision got in there.  There are other drafting errors in this agreement. City of Stockton case on which they relied repeatedly actually supports us and doesn't support their position. What City of Stockton was about was an agreement, party had an agreement to lease some land and was going to construct a convention center and a hotel on it, and he never got the financing to construct the hotel and convention center, and the owner of the property says, hey, I don't have to give him forever to get the financing on this, that wasn't our deal, so he called a breach. And the Court said, in the absence of a specific time, there should be a reasonable time to perform. And that is so. In that particular case, 40 months or three-plus years under the circumstances in that case was long enough for him to get the financing. Finally, the argument that the covenant of good faith and fair dealing doesn't apply. Kagan. You're about out of time, but since they had a few extra questions, I'm going to give you two extra minutes. All right. So wrap up your thoughts. I'm on my last response, so I'll leave the podium. Good faith and fair deal, that the covenant of good faith and fair dealing doesn't apply where there's a statute. I don't know of any case that says that. The California Supreme Court has repeatedly said in Bleacher, in Foley, in Thaxton --"Steiner v. Thaxton," and other cases, that the covenant of good faith and fair dealing is implied in every contract entered into in California. Thank you, Your Honor. Let me add to that. Does anyone in the panel have a question? Yeah, I have a question. Go ahead. You could have sued the utility company in order, if I understood your description of the contract that had been entered into with the utility company with respect to the easement, there was a time that was fixed when they had to essentially give up the easement. You could have, could you have sued to have enforced that provision? Under my reading of the easement, absolutely. The easement promises covenants that it will be removed. First of all, it's called a temporary easement, and it says it will be removed at such time as the LHINs or the underground facilities are available to put the wire underground instead of having an overhead line, which, as the Court also knows, is forbidden in the city of Danville, so, or Dublin. So the, if PG&E had, I'm sorry. Why didn't you sue then? Because the negotiations were continuing, and I understand from, I'm not sure it's reflected fully in the record, but my understanding was that negotiations were going along well. Nobody at PG&E said they wouldn't take it off. Any additional questions? Counselor Struxtool, I have one practical question. Yes, sir. Which may, if it's not reflected in the record here, you don't have to answer. But I was curious, do the LHINs and the Toll Brothers have other ongoing relationships, either with regard to the subareas which were tendered or other deals that are in the background here? The record doesn't reflect what is currently ongoing between the Tolls and, Toll and the LHINs, but the record does reflect, Your Honor, that the LHINs and Toll had engaged in previous projects together successfully. And as this Court knows, successfully mastered subarea 1 and subarea 2 under this purchase and sale agreement. Okay. Thank you. You're welcome, sir. Thank you for your argument. Thank you. All right. You have two additional minutes. Thank you, Your Honor. I'll be as quick as possible here. You'll be two minutes. First of all, it's unbelievable that they didn't sue, and we raised that point. Toll had told them they were in breach. They knew they were at risk of a rescission. Instead, what they did was, well, said to Toll, and it's in the record, we'll actually extend for three years if you give us $5 million nonrefundable. They should have sued for quiet title at their earliest opportunity, and they didn't do so. Instead, they asked for more money. That's number one. Number two. Well, you weren't in such a hurry to get this because, as the district court found and as Judge Gould made clear in his dissenting opinion, there was no rush. You weren't anxious to start building. So why should they, if they could possibly negotiate this without a lawsuit, why shouldn't they have done so when there's nothing in the record that indicates that it was at all material to you, whether it was done in 2007 or, let's say, 2008, or, for that matter, given housing conditions even today? Your Honor, California law is absolutely clear that not giving marketable or agreed upon title is, by definition, material. The fact of the matter is the record reflects that we had a possible interest in flipping that property if we did take it. There was testimony to that effect. And having that easement and that easement of record made that property not marketable. It prevented us from alienating it, and that's why it was an absolute breach. And there was no reason for them not to sue the quiet title. Only good could have come of that. Next. I really don't think anybody can reasonably take the position or pretend that there was no breach of 13.2. All right. Your time is up. All right. And I've given you two additional minutes. So this matter will stand submitted unless my panel members have any additional questions. I have none. All right. Thank you, Your Honor. Thank you. All right. This matter will stand submitted.
judges: Gould, Callahan, Cjj Korman (Edny), Dj